J-S32012-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1183 EDA 2024 |

Appeal from the Order Entered April 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002185-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.V., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1184 EDA 2024 |

Appeal from the Decree Entered April 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000034-2023

BEFORE: LAZARUS, P.J., STABILE, J., and KING, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED OCTOBER 11, 2024**

H.V. (Mother) appeals from the order and decree, entered in the Court of Common Pleas of Philadelphia County Juvenile Division, changing the permanency goal from reunification to adoption and involuntarily terminating her parental rights to her minor child, K.V. (Child) (born 7/18). We affirm.

Mother was sixteen years old when she gave birth to Child in July 2018. At that time, Mother was committed to the Philadelphia Department of Human

Services (DHS) and was receiving services through the Community Umbrella Agency (CUA). On September 22, 2018, DHS received a general protective services (GPS) report that Child had been taken to DHS following a physical altercation among Mother, Maternal Grandmother, and Maternal Aunt. The report was deemed valid. Mother and Child were placed at Carson Valley Children's Aid (Carson Valley). After Mother absconded from Carson Valley with Child, an order of protective custody (OPC) issued. Child was ultimately placed in foster care. Following a shelter care hearing, the OPC was lifted and Child was placed in DHS' custody.

Child was adjudicated dependent on October 30, 2018, and placed in foster care. In December 2018, the court granted Maternal Grandmother temporary legal custody (TLC) of Child. On May 2, 2019, however, the court vacated the TLC arrangement, and granted Child's father (Father) physical custody of Child, with DHS supervision, where they resided in a father-baby placement. However, in January 2020, the court learned that Father had absconded from placement. The court issued an OPC for Child and a bench warrant issued for Father. In February 2020, Child was located and placed in foster care. After a shelter care hearing, the court lifted the second OPC and Child was fully committed to DHS.

On February 6, 2020, reunification was set as Mother's permanency goal and the following single case plan (SCP) was developed for Mother: (1) sign all appropriate and necessary releases; (2) attend school on time daily and complete all assignments; (3) comply with court-ordered visitation; (4)

comply with mental health treatment; (5) make her whereabouts known to CUA; and (6) comply with services. In November 2020, Mother's plan was revised to include the following additional objectives: complete a Behavioral Health Services (BHS) evaluation; attend parenting classes and/or family school; participate in domestic violence and anger management services; comply with probation and any court orders; and obtain stable and appropriate housing. At a March 8, 2021 permanency review hearing, Mother was granted unsupervised day visits with Child. At a July 2021 permanency review hearing, Mother's visitation rights were expanded to include weekend overnight visits with Child. However, at the October 25, 2021 permanency review hearing, Mother's overnight visits were suspended, *see infra* at 5, and visits were ordered to be unsupervised in the community and with CUA to supervise one visit per month.

On January 31, 2023, DHS filed petitions to change the goal to adoption and to involuntarily terminate Mother's parental rights to Child. On April 1, 2024, the court held a goal change/termination hearing, at which DHS case manager, Niema Barnet, and social worker, Roya Paller, testified. Barnet, who had been assigned to Mother's case since November 2021, testified that, over the life of the case, Mother was in moderate compliance with her SCP objectives and that she rated her progress as "moderate" with regard to alleviating the circumstances that brought Child into DHS' care. N.T. Goal Change/Termination Hearing, 4/1/24, at 33-34. However, during cross-examination, Barnet admitted that Mother has been more compliant now than

she had been previously and that she would rate her current compliance as "substantial." *Id.* at 49. *See id.* at 52 (Barnet testifying Mother had satisfactorily completed 7 out of 8 SCP objectives).

In particular, Barnet testified that Mother: had signed releases for any requested information; had been recently compliant with CUA; was currently engaged in mental health treatment as of January 2024; had completed parenting and anger management classes; had obtained housing and a BHS evaluation; had completed an online domestic violence class; and had been fully compliant with her visits. *Id.* at 26-29, 51.[1] Mother's 2022 BHS evaluation recommended that she participate in individual therapy. *Id.* at 28-29.

Barnet clarified that the only SCP objective left for Mother to complete was a successful discharge from mental health treatment, *id.* at 58, but that Child would not be at risk if he were returned to Mother before receiving documentation of her discharge. *Id.* Barnet testified that, over the life of the case, Mother "had a lot of intakes [for mental health treatment, and would] begin but stop" and never successfully complete treatment. *Id.* at 26. Mother had last commenced treatment in December of 2023, eleven months *after* DHS filed its petition to terminate her parental rights. *See infra* at n.4.

Barnet also testified that DHS had concerns about Mother's unsupervised visits due to domestic violence issues between Mother and her

_____

[1] On cross-examination, Barnet admitted that foster parent interfered with Mother's visits and that "Mother is fully compliant" with visits. *Id.* at 51.

former partner, Mother taking Child to Maternal Grandmother's[2] home where there were often physical altercations between Mother and Maternal Grandmother, Mother having unverified individuals living in her home when she had overnight visits with Child, and Mother's house smelling like marijuana during a visit. *Id.* at 29-34. Most recently, in August 2023, Mother had been arrested after engaging in a physical altercation with Maternal Grandmother. *Id.* at 32-33. However, at the time of the termination hearing, Mother's visits were still unsupervised. *Id.* at 54. Barnet testified that because she has never personally observed Mother and Child during a visit, she did not have an opportunity to assess whether there is a bond between Mother and Child. *Id.*

At the time of the termination hearing, Child had been residing in a kinship foster home, a pre-adoptive resource, with his maternal aunt and cousins for three months. *Id.* at 40, 42. Child had been placed in approximately 10 foster homes beforehand because foster parents claimed they could not work with Mother as she was "very difficult [and] ma[de] threats." *Id.* at 41. Child told Barnet that he "wants a family [and] doesn't want to move [homes] again." *Id.* at 57. Barnet testified that Child never asks about Mother or says that he has a desire to see her, that Child looks to his current caregiver for "love, support, care, and comfort," and that Child would not suffer any irreparable harm if Mother's parental rights were

---

[2] Barnet also testified that Maternal Grandmother is an indicated perpetrator of sexual abuse. *Id.* at 31.

terminated. *Id.* at 35-36. To the contrary, Barnet testified that Child would suffer irreparable harm if he were removed from his foster parent/Maternal Aunt's home. *Id.* at 44.

Barnet stated that it was in Child's best interest to be adopted, where he "was safe" living with pre-adoptive foster parents who met his needs. *Id.* at 42. *See id.* at 43-45 (Barnet testifying placement successful where Child has adapted to Maternal Aunt and cousins and wants to stay with them). Finally, Barnet testified that after watching Child and Maternal Aunt interact during visits for the past three months, a total of 30 minutes overall, she believes that "there's an unbreakable bond there [between Child and foster parent/Maternal Aunt]." *Id.* at 56.

Roya Paller testified that she met with Child[3] in January and March of 2024 during which they discussed Child's bond with foster parent/Maternal Aunt. Paller explained the adoption process to Child, and Paller asked Child where he would like to live. *Id.* at 60. Paller stated that Child is happy living with his aunt and cousins, he feels stable living there, and does not want to move to another foster home. *Id.* at 61. Paller testified that Child suffers from trauma as result of frequent moves within the foster care system at such a young age, that he has some behavioral issues, is asthmatic, and "does express his anger." *Id.* at 61-63. However, Paller also testified that foster mother/Maternal Aunt provides Child stability, meets his permanency needs,

_____

[3] Paller noted that Child is "very articulate" for his age and is "wiser in the sense of being able to tell [her] where he is emotionally." *Id.* at 62.

and has offered Mother unlimited phone contact and extra supervised visits with Child, as long as Mother "present[s as] stable." *Id.* at 61-62. Paller recommended "permanency" for Child and that he receive medical and mental health services. *Id.* at 64. Paller, however, acknowledged that she had never observed Child with Mother and, as a result, could not speak to whether there was a parent-child bond. *Id.* at 66.

Following the hearing, the court entered an order changing the permanency goal to adoption and a decree terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b)[4] of the

---

[4] § 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led

*(Footnote Continued Next Page)*

_____

to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent.  **With respect to any petition filed pursuant to subsection (a)(1),** (6) **or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) (emphasis added).

Adoption Act.[5] Mother filed a timely notice of appeal from the order and decree, along with a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother presents the following issues for our review:

(1)    Whether the trial court erred by terminating the parental rights of [M]other[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(1)[,] without clear and convincing evidence of [M]other's intent to relinquish her parental claim or refusal to perform her parental duties.

(2)    Whether the trial court erred by terminating the parental rights of [M]other[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2)[,] without clear and convincing evidence of [M]other's present incapacity to perform parental duties.

(3)    Whether the trial court erred by terminating the parental rights of [M]other[,] pursuant to 23 Pa.C.S.A. [§§] 2511(a)(5) and (8)[,] without clear and convincing evidence to prove that reasonable efforts were made by [DHS] to provide [M]other with additional services and that the conditions that led to the placement of [C]hild continue to exist.

(4)    Whether the trial court erred by terminating the parental rights of [M]other[,] pursuant to 23 Pa.C.S.A. [§] 2511(b)[,] without clear and convincing evidence that there is no parental bond between [M]other and [C]hild and that termination would serve the best interest of [C]hild.

(5)    Whether the trial court erred by changing the permanency goal to adoption[,] pursuant to 23 Pa.C.S.A. [§] 6351[,] without clear and convincing evidence that adoption is in [C]hild's best interest.

(6)    Whether the trial court erred by changing the permanency goal to adoption[,] pursuant to 23 Pa.C.S.A. [§]6351[,] without clear and convincing evidence that reasonable

_____

[5] 23 Pa.C.S.A. §§ 2101-2938.

efforts were made by the servicing agency to reunify [C]hild with [M]other.

(7)     Whether the trial court erred by changing the permanency goal to adoption in contravention of the mandate of 42 Pa.C.S.A. [§] 6302 to preserve the unity of the family whenever possible.

Appellant's Brief, at 8.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.* We may uphold a termination decision if any proper basis exists in the record for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc).

Mother first claims that the trial court improperly concluded that she "refused to perform her parental duties [or] indicated a settled intent to relinquish her parental rights [to Child]," under subsection 2511(a)(1), where

she substantially complied with seven out of eight of her SCP objectives and consistently visited with Child. Appellant's Brief, at 14.

At the time of the termination hearing, Child had been in placement for almost five years, having been out of Mother's care for that duration while he moved "from foster home to foster home—adapting." *Id.* at 36. Moreover, CUA case manager Barnet testified that Mother had failed to complete her SCP objectives, in particular Mother had not provided documentation that she had successfully completed mental health treatment. *See* N.T. Goal Change/ Termination Hearing, 4/1/24, at 52. Barnet was also unaware as to whether, at the time of the termination hearing, Mother was still actively engaged in mental health treatment. *Id.* at 26-27. Additionally, Mother's difficult behaviors caused Child to bounce from foster home to foster home—a total of 10 homes, in fact—over the span of five years. This turmoil has significantly traumatized Child and left him without consistent emotional and physical support over the majority of his time in placement.

Accordingly, we conclude that Mother has failed to perform her parental duties "for a period of at least six months immediately preceding the filing of [DHS' January 31, 2023] petition." 23 Pa.C.S.A. § 2511(a)(1). Because there was clear and convincing evidence to terminate Mother's parental rights under subsection 2511(a)(1), we find no abuse of discretion. *In re A.R.*, *supra*.[6]

---

[6] We need only agree with the court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

Mother next asserts that termination of her parental rights to Child was improper, under subsection 2511(b), where she and Child "have a strong emotional bond[,] Mother was actively engaged as a vital caregiver during the formative time of [C]hild's life[, she] cared [for C]hild, fed him, bathed him and nursed [him] back to health when he was ill[,] and provided financial, emotional[,] and spiritual support for [C]hild."  Appellant's Brief, at 17.

With regard to termination under subsection 2511(b), our Supreme Court has stated that court must consider the following factors:

> [In addition to whether any parent-child bond is necessary and beneficial to the child, a court must also consider] the child's need for permanency and length of time in foster care . . .; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.  These factors and others properly guide the court's analysis of the child's welfare and all [his] developmental, physical, and emotional needs.  Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023) (citations and footnote omitted).

Instantly, neither witness at the termination hearing could testify regarding whether there was a parent-child bond between Mother and Child. The trial court made the following observations regarding a bond and why termination was proper under subsection 2511(b):

> Based on the evidence, this [c]ourt determined that the Child would not suffer any irreparable harm if Mother's parental rights were terminated.  [Child] has been in DHS['] care consistently since February 2020.  He is five years old and has spent over four

years outside of the care and control of Mother. [] Barnet could not testify as to whether a parental bond exited between Mother and [C]hild. However, no testimony was presented regarding there being a bond between Mother and [C]hild that should be preserved. While the testimony reflects that [Child] enjoyed visits with Mother, she is a visitation resource rather than a parental figure. Thus, this [c]ourt properly found that termination of Mother's parental rights would not destroy an existing, necessary, or beneficial relationship between [C]hild and Mother.

Trial Court Opinion, 5/21/24, at 18.

When the record is devoid of evidence of a bond between the parent and the child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). In this case, such an inference is warranted where Child was five years old at the time of the termination hearing, had spent less than three months in Mother's care since his birth, is now in a pre-adoptive kinship home with his Maternal Aunt and cousins where he wishes to remain, Child's developmental, physical, and emotional needs are being met by his Maternal Aunt, and Child has a demonstrated bond with his kinship care provider.

Given the witnesses' testimony about the significant amount of time that Child has spent outside of Mother's care, the frequency with which he has been placed in various foster homes in his short life, and Mother's inability to fully comply with her SCP objectives for more than four years, we conclude that there was clear and convincing evidence to support the trial court's finding that termination served Child's needs and welfare under subsection 2511(b). *See In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) ("[O]ver the past fifteen years, a substantial shift has occurred in our society's approach to dependent

children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [The Adoption and Safe Families Act] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.").

Order and decree affirmed.[7]

King, J., Joins the Memorandum.

Stabile, J., Concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/11/2024

---

[7] Because we affirm the termination decree, the appeal from the goal-change order is moot. **See In the Interest of A.M.**, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (issues regarding goal change moot in light of termination of parental rights); **see also In re D.K.W.**, 415 A.2d 69, 73 (Pa. 1980) (once parental rights are terminated, issues of custody and dependency under Juvenile Act are moot).